ORIGINAL

FILED

JAN 2 2014

U.S. COURT OF
FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION STANDARD, INC.

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 14- 7C

## COMPLAINT

### Parties

1.      Plaintiff, Precision Standard, Inc. ("PSI"), is a corporation organized and existing under the laws of the State of Michigan, with a principal place of business located at 721 E. Saratoga Avenue, Ferndale, Michigan.

2.      Plaintiff is bringing this action against Defendant, the United States of America ("Government"), based on the actions and inactions by the Defense Supply Center Richmond ("DSCR").

### Jurisdiction

3.      This is an action disputing the Debt Determinations and Demands for Payments issued by Contracting Officer's Final Decisions arising under various contracts, resulting from the improper terminations for default issued under the subject contracts.  PSI has previously appealed the wrongful terminations of the subject contracts covered under Counts 1-2, and 4-8 herein, which appeals, are presently before this Court under Case No. 11-558c.  Additionally, this is an action disputing the termination for default and assessment of Reprocurement Costs of

Contract No. SPM4A7-08-D-0274 (Count 3 and Count 3(A) herein)   As such, this Court has

jurisdiction of this action under Section 10 of the Contract Disputes Act of 1978, 41 U.S.C.

§609(a), and the Tucker Act, 28 U.S.C §1491(a).

<u>Summary</u>

4.      On June 24, 2113, the Government's Contracting Officer issued six (6) Final

Decisions relating to numerous contracts awarded to PSI, which had been terminated for default.

These Final Decisions constituted Debt Determinations for: (1) Reprocurement Administrative

Costs; and/or (2) Retesting Costs; and/or (3) Excess Reprocurement Costs.  The contracts

covered by these Final Decisions were as follows:

**COUNT 1:**  Contract No. SPM4A7-08-D-0316 (Administrative Reprocurement Costs);

**COUNT 2:**  Contract No. SPM4A7-08-C-0387 (Administrative Reprocurement Costs);

**COUNT 3(A):**  Contract No. SPM4A7-08-D-0274 (Administrative Reprocurement

Costs);

**COUNT 4:**  Contract No. SPM4A7-08-C-0481 (Administrative Reprocurement Costs);

**COUNT 5:**  Contract No. SPM4A7-07-C-0104 (Retesting Costs);

**COUNT 6:**  Contract No. SPM4A7-08-M-7193 (Excess Reprocurement Costs);

**COUNT 7:**  Contract No. SPM4A7-08-M-A912 (Excess Reprocurement Costs);

**COUNT 8:**  Contract No. SPM4A7-07-M-0637 (Retesting Costs);

**COUNT 9:**  Contract No. SPM4A7-07-M-C357 (Excess Reprocurement Costs);

**<u>COUNT 1 – Contract No. SPM4A7-08-D-0316</u>**

5.       On July 30, 2008 the Government awarded Indefinite Delivery/Indefinite Quantity Purchase Order No. SPM4A7-08-D-0316 to PSI for the manufacture and delivery of Coupling Sleeve Adapters (NSN: 1560-01-372-3084) at a cost of $440.00 per unit.  Units were to be delivered within one hundred eleven (111) days after the receipt of an order.  The contract was for one (1) base year and four (4) option years.

6.       On July 30, 2008, Delivery Order 0001 was issued for forty (40) units, which were to be delivered by November 18, 2008.

7.       By letter dated May 4, 2009, the Government exercised the first option year.

8.       On November 2, 2009, Delivery Order 0002 was issued for seventy-two (72) units to be delivered by February 22, 2010.  On January 6, 2010, Delivery Order 0003 was issued for another eighty-one (81) units to be delivered by April 27, 2010.  Delivery Order 0004 for eighty (80) units to be delivered on June 28, 2010 was issued on March 8, 2010.  On April 8, 2010 Delivery Order 0005 was issued for seventy-nine (79) units to be delivered on July 28, 2010.

9.       On May 17, 2010 the Government issued Modification P00002 exercising Option 2 under the contract.  As of the date of this option exercise, PSI had shipped only two (2) units. No Show Cause letters or Deficiency Notices had been sent to PSI as of the date of the option exercise and no new delivery dates were established.

10.      On September 16, 2010 the Government issued Delivery Order 0006 for two hundred eighty-three (283) units to be delivered on January 5, 2011

11.      Subsequent to the exercise of the second option PSI delivered a total of an additional eighty-six (86) units on June 9, 2010, June 25, 2010 and August 6, 2010.

12.     On November 16, 2010, for the first time, the Government issued a delinquency notice for the subject contract, requesting a delivery status for each of the Delivery Orders.  The notice further stated that before any further shipments will be inspected or accepted, adequate consideration would have to be negotiated as all orders are delinquent.  Additionally, the notice stated that termination was being considered.

13.     PSI responded on November 16, 2010 stating that it was giving this contract priority in view of field calls specifying the need for the units.   The letter further stated that ninety-seven (97) additional units were ready for shipment but as a result of the Government's stop order against the shipment until adequate consideration was negotiated, the shipment has been stopped.  The letter concluded by stating that this was another example that the Government deems its main function to be to extract money from the private sector rather than insuring that supplies were delivered.

14.     The Contracting Officer responded on November 19, 2010, stating that the Government had not issued a Stop Work Order but had stated that DCMA was not authorized to sign off on inspections for any delinquent orders until appropriate consideration could pass to the Government for PSI's delinquency.  Further the response stated that PSI's ignoring the requests for consideration will be taken as an indication that PSI does not wish to perform and that the Government will proceed with issuing a termination for default.

15.     On November 26, 2010 PSI, through counsel, submitted a Claim for Equitable Adjustment taking exception to the Government's allegation that PSI has repudiated the contract, as evidenced by the fact that PSI notified the Government that it had ninety-seven (97) units

4

ready for shipment.  PSI further alleges that it was the Government's November 19, 2010 email

that repudiated the contract.  The Claim further stated that there was no delivery schedule in

place, as a result of the Government waiving the original schedules by continuing to issue

Delivery Orders through September, 2010, by the exercise of two options, by the fact that the

Government never complained about the alleged delinquencies and by having knowledge that

PSI was continuing to produce.  PSI alleged that the Government was in breach of the contract by

threatening a termination for default.  As a result the Claim was submitted in the amount of

$23,012.00 consisting of lost profits for the units not yet manufactured.

16.     The Contracting Officer responded on December 1, 2010 alleging that PSI was

never instructed to cease shipments and that PSI was directed to ship the ninety-seven (97) units

immediately.

17.     On January 27, 2011, the Government terminated the subject contract for default.

18.     On June 24, 2013, the Government issued a Reprocurement Administrative Costs

Final Decision, Debt Determination, and Demand for Payment.  The letter stated that the contract

included clause 49-1-G, DSCR Note to 52.249-9000, which delineates the right of the

Government to recover Administrative Costs of Reprocurement after Default.  Since the subject

contract was terminated for default, the Government alleged that it was entitled to the these costs

in the amount of $385.00, and demand was made for payment.

19.     PSI alleges that the Government had clearly waived the stated delivery schedules

by continually issuing Delivery Orders despite delivery dates being missed and by exercising

options despite alleged delinquencies existed.  Furthermore, the Government failed to re-

establish new delivery dates as required by the FARs.  Therefore, Plaintiff alleges that the

termination for default was improper and that Government is not entitled to the Administrative

Costs of Reprocurement after Default being demanded.

### COUNT 2 - Contract No. SPM4A7-08-C-0387

20.     Contract SPM4A7-08-C-0387 was awarded to PSI on June 6, 2008 for the

purchase of thirty (30) Aircraft Fairings (NSN 1560-00-826-7430), at a cost of $4,250.00/unit, to

be delivered by September 8, 2009.  The Contract also required a first article to be delivered

within one-hundred (140) days ARO, for a cost of $11,000.00.

21.     In an internal email dated May 5, 2010, the Government alleged that PSI was not

making any progress on the contract, and that it was looking to cancel the contract, requesting

that the supply posture be reviewed.  The Government response further stated that the parts were

no longer needed.

22.     On June 8, 2010, the Government notified PSI that since no progress was made,

the contract would be cancelled at no cost.  PSI responded on June 10, 2010, stating that progress

had been made, and that PSI would not accept a unilateral or a bilateral termination.

23.     On or about February 22, 2011 the Contracting Officer issued Show Cause

Notices for eight (8) contracts awarded to PSI including contract 0387. The letter stated that DLA

has reviewed and is prepared to terminate for default eight contracts listed in the appendices

attached to the email, unless PSI accepts a no-cost, no liability termination for convenience.  The

appendices contain urgent Show Cause Notices relating to the eight (8) contracts, stating that PSI

has failed to perform within the requisite time frames and demanding a response within seven (7) days after receipt.

24.     Plaintiff's Counsel responded by letter dated April 7, 2011, contesting the Show Cause Notices, stating in pertinent part the following:

- The Show Cause Notices make no reference to the requisite time frames, which are, in some cases, years old.

- The Government is precluded from threatening PSI with default terminations if PSI will not accept no-cost terminations for convenience.  Pursuant to a course of conduct between the parties, the Government has waived its right to terminate for default and has constructively terminated the contracts for convenience.  As a result, the Government has an obligation to issue formal terminations for convenience and had no right to dump the expended costs on to PSI.

- Per the attached Affidavit of Milan Reeder (Vice-President of PSI), the Government and PSI over the years have had an understanding and have worked together regarding the disposition of the eight (8) contracts as well as PSI's other allegedly delinquent contracts.

- The Government never set new delivery dates on any of these contracts. The Government was well aware that it could not unilaterally set new dates because of its ongoing agreements and obligations with PSI.

- Furthermore, the Government never set new dates because it no longer had a need for the products. The setting of new dates for first articles deliveries would be a sham, and would just lead to a rejection of the first articles so that the Government could either claim further re-testing charges, or terminate for default to escape liability altogether.

25. Included in the above-referenced response to the Show Cause, PSI included a Claim for Equitable Adjustment demanding a Contracting Officer's Final Decision with a modification formally terminating the contract for convenience and compensation for termination for convenience costs in the amount of $3,318.26. No Final Decision was issued by the Contracting Officer.

26. As of the date of the subject Show Cause Notice, the Contract 0387 delivery date for the first article was almost two and one-half (2½) years overdue. Prior to that time, no Cure Notices or Show Cause Notices were issued, and no revised delivery schedule was issued by the Government, as required by the FARs.

27. After the Plaintiff responded to the Show Cause the Government terminated the contract for default on April 27, 2011.

28. On June 24, 2013, the Government issued a Reprocurement Administrative Costs Final Decision, Debt Determination, and Demand for Payment. The letter stated that the contract included clause 49-1-G, DSCR Note to 52.249-9000, which delineates the right of the Government to recover Administrative Costs of Reprocurement after Default. Since the subject

contract was terminated for default, the Government alleged that it was entitled to the these costs in the amount of $385.00, and demand was made for payment.

29.     Plaintiff alleges that the Government failed to re-establish new delivery dates as required by the FARs.  Therefore, Plaintiff alleges that the termination for default was improper and that Government is not entitled to the Administrative Costs of Reprocurement after Default being demanded.

### COUNT 3 - Contract No. SPM4A7-08-D-0274

30.     Indefinite quantity contract SPM4A7-08-D-0274 was awarded to PSI on June 23, 2008, for Wing to Fuselage Fairing Panels (NSN 1560-00-824-6428), at a cost of $5,200.00/unit for base year.  The Contract also required a first article to be implemented on the first delivery order, and which was due within one hundred ten (110) days ARO, at a cost of $21,000.00.  The Government would then have one hundred thirty-five (135) days for testing and evaluation, and production units would be delivered three hundred thirty-eight (338) days after first article approval.

31.     Delivery Order 0001 ("DO #1") was issued on September 19, 2008 for fifteen (15) units, with delivery due on April 26, 2010.  No mention was made of the first article.

32.     Delivery Order 0002 ("DO #2") was issued on December 5, 2008 for seventeen (17) units, to be delivered on November 9, 2009.  DO #2 makes reference to a first article for the first time, requiring delivery of the First Article by March 25, 2009.

33.     PSI raised the Delivery Order scheduling inconsistency problems, and as a result, the Government issued unilateral Modification 000101 on March 16, 2009, amending the DO #1

delivery schedule.  The first article was now due on July 6, 2009, the Government testing and

evaluation was due on November 11, 2009, and the production units were due on November 11,

2010.  The Modification also increased the amount of DO #1 by $21,000, to cover the first article

cost.  DO #2 was not modified, despite the fact that it also referenced a first article to be

delivered on a different date.

34.      On May 28, 2009, Modification P00001 was issued, exercising the first contract

option.

35.      On February 3, 2010, the Government requested a partial termination of eleven

(11) units due to over-procurement.  PSI agreed to the partial termination on February 23, 2010,

which was formalized in Modification 000201 on February 24, 2010.

36.      On June 24, 2010, the Government issued Modification P0002, exercising the

second option period, despite the fact that the First Article delivery was almost eleven (11)

months past due, which shows the Government's willingness to extend out the scheduled

delivery dates

37.      On or about February 22, 2011 the Contracting Officer issued Show Cause

Notices for eight (8) contracts awarded to PSI including contract 0274. The letter stated that DLA

has reviewed and is prepared to terminate for default eight contracts listed in the appendices

attached to the email, unless PSI accepts a no-cost, no liability termination for convenience.  The

appendices contain urgent Show Cause Notices relating to the eight (8) contracts, stating that PSI

has failed to perform within the requisite time frames and demanding a response within seven (7)

days after receipt.

10

38.     Plaintiff's Counsel responded by letter dated April 7, 2011, contesting the Show Cause Notices, stating in pertinent part the following:

- The Show Cause Notices make no reference to the requisite time frames, which are, in some cases, years old.

- The Government is precluded from threatening PSI with default terminations if PSI will not accept no-cost terminations for convenience.  Pursuant to a course of conduct between the parties, the Government has waived its right to terminate for default and has constructively terminated the contracts for convenience.  As a result, the Government has an obligation to issue formal terminations for convenience and had no right to dump the expended costs on to PSI.

- Per the attached Affidavit of Milan Reeder (Vice-President of PSI), the Government and PSI over the years have had an understanding and have worked together regarding the disposition of the eight (8) contracts as well as PSI's other allegedly delinquent contracts.

- The Government never set new delivery dates on any of these contracts. The Government was well aware that it could not unilaterally set new dates because of its ongoing agreements and obligations with PSI.

- Furthermore, the Government never set new dates because it no longer had a need for the products.  The setting of new dates for first articles deliveries would be a sham, and would just lead to a rejection of the first articles so that the

11

Government could either claim further re-testing charges, or terminate for default to escape liability altogether.

39.     Included in the above-referenced response to the Show Cause, PSI included a Claim for Equitable Adjustment demanding a Contracting Officer's Final Decision with a modification formally terminating the contract for convenience and compensation for termination for convenience costs in the amount of $57,468.89.  No Final Decision was issued by the Contracting Officer.

40.     As of the date of the subject Show Cause Notice on February 22, 2011, the Contract delivery date for the First Article was over one and one-half (1½) years old.  Prior to that time, no Cure Notices or Show Cause Notices were issued, and no revised delivery schedule was issued by the Government, as required by the FARs.

41.     On May 13, 2011, the Government improperly terminated the contract for default.

42.     Plaintiff alleges that due to the fact that the Government failed to re-establish new delivery dates as required by the FARs, and further breached the contract by failing to issue a Contracting Officer's Final Decision of Claim for Equitable Adjustment submitted prior to the issuance of the default termination, the termination for default was improper.

## COUNT 3(A) - Contract No. SPM4A7-08-D-0274

43.     On June 24, 2013, after the Government improperly terminated contract SPM4A7-08-D-0274 for default, the Government issued a Reprocurement Administrative Costs Final Decision, Debt Determination, and Demand for Payment.  The letter stated that the contract included clause 49-1-G, DSCR Note to 52.249-9000, which delineates the right of the

Government to recover Administrative Costs of Reprocurement after Default.  Since the subject contract was terminated for default, the Government alleged that it was entitled to the these costs in the amount of $385.00, and demand was made for payment.

44.     Plaintiff alleges that since the termination for default was improper, as alleged in Count 3, the Government is not entitled to the Administrative Costs of Reprocurement after Default being demanded.

### COUNT 4 – Contract No. SPM4A7-08-C-0481

45.     Contract No. SPM4A7-08-C-0481was awarded to PSI on August 16, 2008 for ten (10) Access Doors (NSN 1560-01-120-4665), to be delivered one hundred eighty (180) days after first article approval, at a cost of $5,775.00/unit.  One first article was to be delivered one hundred eighty (180) days ARO at a cost of $21,900.00.  Government mylars were to be supplied within thirty (30) days ARO.  The mylars were not provided until November 3, 2008 some two (2) months late.

46.     The Government notified PSI on June 3, 2010 that the contract was delinquent, and requested confirmation of delivery status of First Article.  On June 25, 2010, PSI responded that it intended to ship, with no firm date given.  This contract is one of the very few times that the Government requested a status of the First Article.  The Government could have unilaterally reset the delivery dates, but failed to do so.

47.     On or about February 22, 2011 the Contracting Officer issued Show Cause Notices for eight (8) contracts awarded to PSI including contract 0481. The letter stated that DLA has reviewed and is prepared to terminate for default eight contracts listed in the appendices

attached to the email, unless PSI accepts a no-cost, no liability termination for convenience.  The appendices contain urgent Show Cause Notices relating to the eight (8) contracts, stating that PSI has failed to perform within the requisite time frames and demanding a response within seven (7) days after receipt.

48.     Plaintiff's Counsel responded by letter dated April 7, 2011, contesting the Show Cause Notices, stating in pertinent part the following:

- The Show Cause Notices make no reference to the requisite time frames, which are, in some cases, years old.

- The Government is precluded from threatening PSI with default terminations if PSI will not accept no-cost terminations for convenience.  Pursuant to a course of conduct between the parties, the Government has waived its right to terminate for default and has constructively terminated the contracts for convenience.  As a result, the Government has an obligation to issue formal terminations for convenience and had no right to dump the expended costs on to PSI.

- Per the attached Affidavit of Milan Reeder (Vice-President of PSI), the Government and PSI over the years have had an understanding and have worked together regarding the disposition of the eight (8) contracts as well as PSI's other allegedly delinquent contracts.

14

- The Government never set new delivery dates on any of these contracts. The Government was well aware that it could not unilaterally set new dates because of its ongoing agreements and obligations with PSI.

- Furthermore, the Government never set new dates because it no longer had a need for the products. The setting of new dates for first articles deliveries would be a sham, and would just lead to a rejection of the first articles so that the Government could either claim further re-testing charges, or terminate for default to escape liability altogether.

49. Included in the above-referenced response to the Show Cause, PSI included a Claim for Equitable Adjustment demanding a Contracting Officer's Final Decision with a modification formally terminating the contract for convenience and compensation for termination for convenience costs in the amount of $2,614.33. No Final Decision was issued by the Contracting Officer.

50. As of the date of the subject Show Cause Notice, the Contract delivery date for the first article was over two (2) years old. Prior to that time, no Cure Notices or Show Cause Notices were issued, and no revised delivery schedule was issued by the Government, as required by the FARs.

51. Subsequent to PSI's response to the Show Cause Notice, on April 27, 2011, the Government improperly terminated the contract for default.

52. On June 24, 2013, the Government issued a Reprocurement Administrative Costs Final Decision, Debt Determination, and Demand for Payment. The letter stated that the contract

included clause 49-1-G, DSCR Note to 52.249-9000, which delineates the right of the Government to recover Administrative Costs of Reprocurement after Default. Since the subject contract was terminated for default, the Government alleged that it was entitled to the these costs in the amount of $385.00, and demand was made for payment.

53.      Plaintiff alleges that the Government failed to re-establish new delivery dates as required by the FARs. Therefore, Plaintiff alleges that the termination for default was improper and that Government is not entitled to the Administrative Costs of Reprocurement after Default being demanded.

### COUNT 5 – Contract No. SPM4A7-07-C-0104

54.      On March 23, 2007, DSCR awarded Contract No. SPM4A7-07-C-0104 ("0104"), to PSI in the amount of $154,300.00 for the manufacture and delivery of 33 Upper Thrust Reverser Fan Cowling Covers (NSN: 1560-00-494-8676) at $3,900.00 per unit. PSI was also required to submit two first articles at a cost of $25,600.00, with Warner Robins conducting the first article evaluation.

55.      On June 1, 2007, PSI asked for the Government's assistance regarding one of the parts used in the final unit. Specifically, PSI requested assistance in checking its drill template that would be used to make the required predrilled mounting holes. Since the drill template was not supplied as "GFM", PSI had made their own template in accordance with the drawing and requested that the Government check it on a C-5 fan cowling. The Government failed to respond to PSI's request for assistance, and as a result, the request was again made in an email dated July 25, 2007. No assistance was ever provided by the Government.

56.     Despite not receiving the requested assistance, PSI proceeded to manufacture the two first articles, which were delivered to Warner Robins.  On or about January 23, 2008, the first articles were rejected, allegedly based upon what appeared to be minor deviations with respect to certain dimensional requirements.  PSI was authorized to resubmit the first article for which a $5,880.20 retesting charges would be assessed.  PSI immediately requested the return of the first articles.

57.     By letter dated February 14, 2008, PSI responded to the First Article rejection by stating that before the units were shipped, PSI's quality engineers carefully and properly measured the dimensions prior to the application of the required coating and reported that the parts were made to print.  PSI further provided a detailed response to each of the alleged deficiencies, which indicated a possible problem with the Government's testing methodology or possible measurement errors.  To avoid shipping the parts back to the Government, PSI requested that the parts be reviewed again, in the expectation that a full/conditional approval would be issued.

58.     On or about March 20, 2008, PSI received the rejected first articles, but did not receive a response to its February 14, 2008 letter.

59.     On or about May 7, 2008, the Government rejected PSI's request for conditional first article approval, claiming that Warner Robins performed a form, fit, and function check, alleging that the unit failed this check. No substantive response was made addressing the allegations made in PSI's February 14, 2008 letter.

60.     On or about September 3, 2008, PSI delivered a second first article submission.

Pursuant to the terms of the contract, the Government had one-hundred twenty (120) days to conduct its testing of the units. On February 20, 2009, PSI requested a status on the first article, which was sixty (60) days past due for a determination.

61.      On April 15, 2009, three and one-half months after it was contractually due, Warner Robins rejected PSI's first article submission, again alleging minor dimensional problems and some delamination. PSI was given the right to resubmit for the third time for a retesting charge in the amount of $6,062.47.

62.      On May 4, 2009, PSI requested that the Government return the rejected first article. On May 13, 2009, PSI advised that it needed to evaluate the returned first article prior to making any decision regarding resubmission. On June 18, 2009, PSI again advised that it needed to have the first article returned to it for evaluation, as it had not yet been returned. The first article was returned on or about August 5, 2009, three months after it was originally requested.

63.      On January 4, 2010, the Government issued unilateral Modification P00002, cancelling the contract at no cost to the Government or contractor, and stripped the funding of $128,700.00 out of the contract.

64.      As PSI had not agreed to a no-cost termination for convenience, on or about April 30, 2010, PSI forwarded termination inventory schedules to Contracting Officer Carl Hudson.

65.      By letter dated May 4, 2010, Contracting Officer Zina Savage sent PSI a Show Cause Notice. The Government contended that PSI agreed to a no-cost unilateral modification, because of an alleged email dated November 24, 2009. This purported November 24, 2009 allegedly inquired as to whether PSI was submitting another first article, and further alleged that

if no correspondence was received from PSI by December 3, 2009, the Government would issue a modification cancelling the contract. PSI has no record of this alleged November 24, 2009 email. Regardless, the Government took no action with respect to this alleged email until the May 4, 2010 Show Cause Notice.

66.     The May 4, 2010 Show Cause Notice also alleged that the January 4, 2010 modification was issued in error since it was issued unilaterally, when it fact it was required to be issued bilaterally, and claimed that Modification P00002 had been rescinded. The Government had de-obligated all funds on the contract pursuant to Modification P00002. There was no modification issued either rescinding Modification P00002, or re-obligating the funding for the contract.

67.     On or about May 11, 2010, PSI responded to the Show Cause Notice, stating that in June, 2007, PSI had requested for assistance with respect to PSI's drill template, to which the Government refused to respond. The first article was then rejected, with a demand from the Government of $5,880.20 for retesting charges. PSI requested that the Government review its measurements and issue a full/conditional approval, because they believed there were errors in the Government's measurements. Without agreeing to the demand for retesting costs, PSI submitted a second first article on September 4, 2008. It was not until April 15, 2009, more than the 120 days allowed by the contract, that the Government rejected the first article on alleged dimensional discrepancies that were not noted on the initial first article submission. This time around, Warner Robins demanded $6,062.47 for testing of another submission. Plaintiff alleges that both parts conformed to the Government specification.

68.     On or about June 30, 2010, PSI submitted a follow-up, as it had not received a response to its May 11, 2010 letter.  PSI stated that that it had corrected all alleged disparities in its first article; yet when it re-submitted the first article, Warner Robins alleged ten additional alleged disparities that had not been alleged with respect to the first submission.  PSI noted that it felt that Warner Robins had an improper conflict of interest, as it had been using first article testing as an avenue for profit, charging exorbitant retesting fees.  PSI further requested that since Warner Robins is a fierce competitor to PSI, they should be disqualified from testing PSI's product.

69.     The Government failed to respond to any of the issues raised by PSI in its previous letters.  Instead, on September 3, 2010, the Government sent PSI a letter, terminating the contract for default.

70.     On June 24, 2013, the Government issued a Retesting Costs Final Decision, Debt Determination, and Demand for Payment.  The letter stated that pursuant to the First Article Approval - Government Testing clause, 52.209-4, the costs for performing the tests on the second first article submission are to be borne by PSI.  Therefore, the Contracting Officer made a Debt Determination and Demand for Payment for these retesting costs in the amount of $6,062.47.

71.     Plaintiff alleges that both of its first article submissions met all the requirements of the contract and were improperly rejected.  Plaintiff alleges that as a result of the improper rejections, the default termination of the contract was improper and therefore the Government is not entitled to the retesting costs being demanded.

## COUNT 6 – Contract No. SPM4A7-08-M-7193

72.     On or about March 5, 2008, the Government awarded to PSI Purchase Order Contract No. SPM4A7-08-M-7193 for the manufacture of 20 Assembly Panels (NSN 1560-00-400-3904) to be delivered within 135 days after first article approval at a cost of 3,200.00 per unit.  A first article was required to be submitted within 170 days (approx. August 22, 2008) of the award of the contract at a cost of $7,500.00.

73.     On or about September 10, 2009, PSI submitted the First Article.  Based upon best information and belief, PSI never received any notice from the Government regarding the disposition of the submitted first article.

74.     On July 8, 2011, the Government issued a letter referencing three of PSI's contracts, including contract 7193, stating in pertinent part the following:

a)      The referenced contracts included first articles which PSI submitted and which were rejected.  In each case PSI was notified of the rejection and a response was requested;

b)      In the spirit of good faith and cooperation, Government is offering PSI a chance to resubmit a first article, or as an alternative, a no-cost cancellation of the contracts, rather than issuing a default termination.

c)      Therefore PSI is to identify: (1) whether PSI intends to resubmit a first article; (2) identify proposed shipment date for resubmission, or; (3) if PSI does not intend to resubmit, identify whether it will accept a no-cost termination;

d)      Response must be made by July 31, 2011.  Failure to respond will be deemed as an indication that PSI is repudiating the contracts.

21

75.   PSI issued a partial response to both letters on July 31, 2011, which in pertinent part, stated the following:

a)   The Government's charges of delinquency are in themselves delinquent. There is no effective schedule in place as to which PSI could be charged with tardiness. The assertions are pure bullying. It has dilatorily waived any authority it may have had to make the present demands;

b)   Every charged delay was directly the result of government wrongdoing, delay and interference. Whether technically tardy, the deliveries are not delinquent.

c)   The letter further reiterated the facts relating to the Government's improper actions, including conflict of interest in an attempt to circumvent the prohibitions in the FAIR Act regarding organic manufacturing, which was also raised;

d)   The letter further reiterated the facts relating to the major assault PSI was facing as a result of the improper actions of the Government which were geared to blocking spare-parts procurement and the terminations for default of numerous contracts;

e)   PSI demanded that the Government supply it with all information regarding all terminated contracts as to whether there was any need for the spare parts being ordered under the contracts.

76.   Prior to the date of the above-referenced July 8, 2011 letter, no Cure Notices or Show Cause Notices were issued, and no revised delivery schedule was issued by the Government, as required by the FARs.

77.     On September 1, 2011, the Government issued Modification P00001 terminating the contract for default for failure to make delivery.

78.     On June 24, 2013, the Government issued a Final Decision, Debt Determination, and Demand for Payment for Excess Reprocurement Costs, per the default clause in the contract. Therefore, the Government alleged that it was entitled to the these costs in the amount of $11,516.00, and demand was made for payment.

79.     Plaintiff alleges that, as a result of the Government's failure to issue any notice regarding the disposition of the first article and failure to re-establish the delivery schedules as required by the FARs, the termination for default was improper and therefore the Government is not entitled to the excess reprocurement costs being demanded.

### COUNT 7 – Contract No. SPM4A7-08-M-A912

80.     On or about June 16, 2008, the Government awarded Purchase Order Contract No. SPM4A7-08-M-A912 to PSI for the manufacture of 385 Retainer Assemblies (NSN 1560-01-062-1123) to be delivered within 200 days after first article approval at a cost of $10.00 per unit. A first article was required to be submitted within 250 days (February 5, 2009) of the award of the contract at a cost of $3,000.00.

81.     On July 8, 2011 the Government issued a letter referencing 12 of PSI's contracts, including A912, stating, in pertinent part the following:

a)      PSI was delinquent on the referenced contracts. The contracts required the submission of a first article, which PSI failed to submit;

23

b)     In the spirit of good faith and cooperation, Government is offering PSI a chance to revise the schedule for submitting the first articles, presuming adequate consideration is paid;

c)     Alternatively, PSI may request a no-cost cancellation of the delinquent contracts, rather than forcing the Government to issue a termination for default;

d)     If PSI intends to perform, it must supply proposed shipment date for first article;

e)     Response must be made by July 31, 2011.  Failure to respond will be deemed as an indication that PSI is repudiating the contracts.

82.     As of the date of the above-referenced July 8, 2011 letter, the Contract delivery date for the first article was almost 2½ years old.  Prior to that time, no Cure Notices or Show Cause Notices were issued, and no revised delivery schedule was issued by the Government, as required by the FARs.

83.     PSI issued a partial response to both letters on July 31, 2011, which in pertinent part, stated the following:

a)     The Government's charges of delinquency are in themselves delinquent. There is no effective schedule in place as to which PSI could be charged with tardiness.  The assertions are pure bullying.  It has dilatorily waived any authority it may have had to make the present demands;

b)     Every charged delay was directly the result of government wrongdoing, delay and interference. Whether technically tardy, the deliveries are not delinquent.

c)      The letter further reiterated the facts relating to the Government's improper actions, including conflict of interest in an attempt to circumvent the prohibitions in the FAIR Act regarding organic manufacturing, which was also raised;

d)      The letter further reiterated the facts relating to the major assault PSI was facing as a result of the improper actions of FAWA which were geared to blocking spare-parts procurement and the terminations for default of numerous contracts;

e)      PSI demanded that the Government supply it with all information regarding all terminated contracts as to whether there was any need for the spare parts being ordered under the contracts.

84.      On September 1, 2011, the Government issued Modification P00001 terminating the contract for default for failure to make delivery.

85.      On June 24, 2013, the Government issued a Final Decision, Debt Determination, and Demand for Payment for Excess Reprocurement Costs, per the default clause in the contract. Therefore, the Government alleged that it was entitled to the these costs in the amount of $12,489.00, and demand was made for payment.

86.      Plaintiff alleges that, as a result of the Government's failure to re-establish the delivery schedules as required by the FARs, the termination for default was improper and therefore the Government is not entitled to the excess reprocurement costs being demanded.

## COUNT 8 – Contract No. SPM4A7-07-M-0637

87.      On October 25, 2006, the DSCR Richmond awarded Purchase Order SPM4A7-07-M-0637 to PSI for the manufacture and delivery of 12 Cowlings (NSN 1560-00-711-1344 at a cost of

25

$7,800.00 per unit.  The contract also required the submission of a First Article, to be delivered within 120 days ARO at a cost of $21,900.00.  The Government had 120 days to conduct its first article testing. Production units were to be delivered within 120 days after first article approval.

88.    PSI immediately began to take the steps necessary to produce the required first article, including the purchase of necessary tooling and material and conducting the review of the pertinent drawings and specifications.  It was during this review that PSI discovered that documents were missing which were needed to determine the required material for the subparts of the assembly.  By letter dated February 9, 2007, PSI requested that the needed documents be supplied. Additionally, in this letter PSI also stated that it appeared that the Power Plant Station appeared to be out of position on the drawing and needed to be repositioned inward.   The Government failed to supply the requested documentation in a timely manner.

89.    On or about March 29, 2007, the Government asked if PSI was able to expedite shipment. PSI responded stating that it could not expedite because of its request made in its February 9th letter. The Government continued to fail to supply the missing documentation.

90.    After waiting over two months for a response, PSI again made its document request in a letter dated April 25, 2007.  On May 9, 2007 the Government issued a Request for Engineering Support requesting advice as to PSI's request for documents and as to its concerns regarding the repositioning of the Power Plant Station.

91.    PSI again requested the documents for the 4th time on May 21, 2007.  Over 2½ months after PSI sent its first request for the missing documents, the Government sent an email to PSI stating that it must justify its need for the requested drawings, since they were not for the same

26

part being produced.   Additionally, the Government requested a more detailed explanation was needed regarding the alleged repositioning PSI was making.   PSI responded by letter dated May 30, 2007.

92.      Finally, on or about May 30, 2007, PSI was provided the necessary drawings, but was not given a response to its Power Plant Station positioning.   On June 28, 2007, the Government responded stating that it was their belief that the Power Plant Stations were not out of position.   No supporting information was supplied.

93.      As a result of the delays resulting from the incomplete TDP, on July 26, 2007, the Government issued unilateral Modification P00001 revising: the first article delivery date to September 15, 2007, Government testing to January 13, 2008, and Production delivery to May 13, 2008. PSI shipped the first article on October 22, 2007, despite the fact that it had not received an adequate response to its concerns regarding the Power Plant Stations position.

94.      The Government did not complete its first article testing within the time allotted by the contract, and didn't notify PSI until May 21, 2008 that the first article was rejected, despite the fact that its first article report was issued on March 11, 2008, over two months earlier.   The rejection was based upon that: (1) the Loft contour did not comply with the drawing in the lower forward corner, and (2) the Spot Weld did not conform to AWS 17.1 for Class A welds.   The Government further stated that PSI had the opportunity to resubmit 2 first articles and will be charged $11,000.00 for retesting costs.

95.      PSI responded to the rejection by letter dated May 29, 2008, which in pertinent part stated the following:

(a)     Requested the return of the remaining first article sample and the return of the parts of the destroyed unit in order to help understand rejection;

(b)     Requested a full copy of the Warner Robins test report documents;

(c)     Confirm that no fit check was performed and that rejection of loft contour was based solely on the drawings;

(d)     State if the WR report does not fully elucidate the basis for the loft rejection.  PSI's expensive Master Model was professionally manufactured to the dimensions on the drawings in the TDP and the loft and contour mylar and full detail is necessary to determine if there is an error in the Master Model;

(e)     State whether any hand pressure, simulating mounting, was applied to effect conformity;

(f)     Amplify any incompleteness in the WR test report as to exactly, chapter and verse of AWS 17.1 to which the welds are asserted not to conform.

(g)     Provide copy of any communication discussing the re-testing costs;

(h)     PSI will respond further after we re-inspect the samples, but state our intent to perform the contract.

96.     In regards to the Government's allegation that the Loft contour did not comply with the drawing in the lower forward corner, PSI alleges that the Government has failed to provide any proof that such a deficiency exists, as evidenced by the following:

(a)     Pursuant to the terms of the contract, PSI was required to manufacture the cowling pursuant to the detailed drawings provided with the contract.  Included in the drawing was the specific loft contour measurement.  PSI proceeded to produce the first article unit which met all the

requirements of the drawing, including the loft contour measurement.  The contract was also required to pass a fit, form and function test.

(b)     Per the first article test report, the Government alleged that the loft contour did not meet the requirements of the drawing.  However, in the same report, the Government admitted it had no capability to measure the loft contour.  Therefore, there is no proof that the first article did not meet the loft contour measurement.  PSI's alleges that the first article was professionally and precisely manufactured to the dimensions on the drawings. Therefore, since the Government was unable to measure the loft contour, there is no evidence that the contour was not in compliance with the applicable drawing.

(c)     Since the Government was unable to verify the contour measurement of PSI's unit, the allegation that the contour deficiency existed was, therefore, presumably based solely upon the findings of the Fit, Form and Function testing, which alleged that the unit did not fit into the C-130 Engine.  As a result, the Government determined that the forward lower corner needed to be more curved.  However, since the Government could provide no proof that the contour in the first article was not per the applicable drawing, the allegation that the loft contour was not compliant was completely unsupported.

(d)     PSI alleges that when the Government supplies a design drawing with the contract, it carries with it a warranty that if the drawing requirements are met an acceptable product would result. PSI alleges that it produced the first article pursuant to the required dimensions/ measurements, including the loft contour.  If the unit was dimensionally compliant, as PSI alleges, by virtue of the warranty, the unit should have passed the form, fit and function test.

29

Therefore, it is alleged that the resulting failure of the fit, form and function test had to have been caused by defective Government supplied drawings or by the Government attempting to utilize an aircraft that exhibited non conformances or other defects that would preclude a successful fit, form and function test.   Based upon information and belief Warner Robins had no ability to check the aircraft for conformance to the drawings, and failed to conduct an aircraft check prior to performing the fit, form and function test.

97.     The Government failed to respond to PSI's response letter in a timely manner.  In an email dated July 30, 2008 PSI again requested the return of the failed unit and parts and the information requested in the May 29th communications.  Again the Government failed to respond and again PSI reiterated its requests in an e-mail dated August 14, 2008.

98.     The Government's delay continued and on September 11, 2008, PSI again requested the return of the first article unit and parts and clarification of the alleged loft non-conformance.  For the 5th time PSI requested the return of the parts and the information by email dated September 24, 2008.

99.     The Government continued to ignore PSI's request, but somehow found the time, in an email dated September 30, 2008 to ask for the status of the allegedly delinquent contract.  PSI responded the same date by attaching copies of the numerous requests that were previously made.

100.    The Government finally responded to items 2-6 of the May 29th letter on October 27, 2008, five months after the information was requested.  The Government's response amounted to making a statement that a fit check was conducted, which was the basis for the rejection, and supplying PSI with a copy of the test report. However, no mention was made as to the return of the

rejected first articles and parts.

101.    On November 22, 2008, the Government asked if PSI intended to supply another FAT.  PSI responded stating that the new FAT would be submitted by the end of January, 2009, and they again requested the return of the rejected first article.

102.    On January 30, 2009, the Government requested the status of the new FAT. Unconscionably, the Government further alleged that the contract was delinquent and a contract modification needed to be done revising the delivery date.  The Government further stated that PSI had to offer an explanation of the delay and offer consideration for the delivery extension.

103.    The Government-caused delays and disruption continued.  PSI responded to the Government's January 30th email by stating that the new first article had not been shipped because it was still waiting for the return of the rejected first article, as was repeatedly requested for.  It must be restated that in PSI's May 29, 2008 response to the first article rejection, it requested the return of the rejected first article for the specific purpose of aiding them in its understanding of the rejection. In a letter dated February 4, 2009 PSI stated that per a telecom with the Government, it would prefer to have the rejected part shipped back to insure that that all issues are addressed.  However, if the Government was not going to ship the units back, PSI asked to be advised.

104.    The Government responded on February 6, 2009 stating that a request had been made to have the first article returned.  However, in the same communication the Government asked: "Meanwhile, are you not sending the 2nd FAT anytime soon?"

105.    PSI finally received the rejected first article back on February 11, 2009, 8½ months after it was first requested.  PSI stated that it would get back to the Government as to when the 2nd

regarding the brackets, the other alleged deficiencies could also be based upon the use of the improper drawing.

109.    Therefore, PSI alleges that as a result of the Government's indicated use of the improper drawing, the rejection of the first article was inherently improper.

110.    Inexplicably and in direct contradiction with the second first article rejection which stated that PSI was not allowed to submit another first article, on March 4, 2010, the Government requested a status of the "delinquent" contract.

111.    In the succeeding 15 months, there was no further communication from the Government and the contract remained in abeyance. On July 8, 2011, which was almost 19 months after PSI received the rejection of the second first article, the Government issued a letter stating that, despite the fact that PSI had failed first article testing twice, it was going to give PSI the opportunity to resubmit another first article.  The letter further stated that a failure to adequately and/or timely file respond will be an indication that PSI is repudiating the contract.  PSI alleges that this letter was issued because the Government realized that it had administratively mishandled the contract by leaving the contract in limbo for 15 months.  the subject contract had been in "limbo" since the rejection of the second first article rejection, due to the Government's lack of action.

112.    PSI responded by letter dated July 31, 2011 stating, in pertinent part, that the Government's charges of delinquency were in themselves so delinquent, there is in law no effective schedules as to which could be charged with tardiness.  The Government's assertions constituted bullying.  The letter further stated that the Government has dilatorily waived any authority it may have had to make the demands it has presented.  The letter further condemned the continuing of

actions of the newly formed "FAWA" group and its self-serving endeavor to reincarnate lost government rights or to destroy PSI's contracts for the blind purpose of dumping FAWA's workload burden.

113.    On September 10, 2011, the Government issued Modification P00002, improperly terminating the subject contract for default.

114.    On January 9, 2012 PSI submitted a Claim for Equitable Adjustment pursuant to the Contract Disputes Act, demanding compensation for all costs expended on the contract in the amount of $84,421.55 as a result of the Government's improper actions and inactions. Specifically, PSI claimed for all costs attributable to all costs relating to the improper rejections of the First Articles and for costs resulting from Government-caused delays.

115.    The Contracting Officer issued a Final Decision, denying PSI's Claim for Equitable Adjustment on February 13, 2012, alleging the following:

(a)    PSI repudiated the contract in its response to the Government's letter of July 8, 2011.  As a result, the contract was terminated for default and therefore, PSI may not recover its costs under the contract.

(b)    PSI's first articles were properly rejected due to the welding deficiencies and the loft contour deficiency.  In regard to the loft contour deficiency, the Contracting Officer did not address PSI's allegation that the wrong drawing was used, but alleged that PSI did not understand the form, fit and function test.

(c)    In regard to the alleged delays, the Contracting Officer alleged that it was PSI's responsibility to insure that it had all the necessary data before it submitted its bid. It was PSI's failure to

34

request allegedly missing documentation until February, 2007 that caused PSI to fail to timely perform the contract.

(d)     The Government generously extended the delivery dates after supplying the requested documents, which PSI failed to meet.  Also, PSI failed to supply the second first article in a timely manner.  Therefore, there was no compensable delay.

116.    In regard to the Final Decision, PSI alleges the following:

(a)     In regard to the allegation that PSI is not entitled to costs expended under the contract due to the termination for default, PSI alleges that even if the termination for default, which PSI alleges was improper, is upheld, that does not preclude PSI from being entitled to compensation under a Claim for Equitable Adjustment for Government-caused problems and delays.

(b)     In regard to the allegation that the first article failed the fit, form and function test and that PSI did not understand the test, PSI alleges that the Government did not understand the process.  The cowlings to be provided must meet two contract requirements;  (1) the part must be made pursuant to the contract drawings and specifications, and; (2) the part must pass the fit form and function test.  Since the drawings and specifications carry with them a warranty that if the part is manufactured per the drawings/specifications, a compliant product would result.  It must be noted that there was no indication in either first article rejection, or in the Final Decision, that the cowlings submitted did not meet any of the manufacturing requirements contained in the drawings/specifications, resulting in the reasonable presumption that all manufacturing requirements were met.  However, allegedly, neither first

35

article passed the fit, form and function testing. Therefore, the only reasonable conclusion is either: (1) the drawings/specifications were defective in that a part made to the requirements did not result in an acceptable part, or; (2) the aircraft being used for the fit, form, and function test were somehow out of conformance due to age or use and were no longer capable of accepting a new part. In either case, the liability for the test failure lies with the Government and not PSI.

(c)     Notwithstanding the Government's allegations that it was PSI that delayed its own performance, and that necessarily precluded compensation for delay, PSI alleges that it is entitled to be compensated for the delays that were solely caused by the Government.

117.    On June 24, 2013, the Government issued a Retesting Costs Final Decision, Debt Determination, and Demand for Payment. The letter stated that pursuant to the First Article Approval - Government Testing clause, 52.209-4, the costs for performing the tests on the second first article submission are to be borne by PSI. Therefore, the Contracting Officer made a Debt Determination and Demand for Payment for these retesting costs in the amount of $3,623.76.

118.    Plaintiff alleges that both of its first article submissions were improperly rejected. Plaintiff alleges that as a result of the improper rejections, the default termination of the contract was improper and therefore the Government is not entitled to the retesting costs being demanded.

### COUNT 9 - Contract No. SPM4A7-07-M-C357

119.    Purchase Order Contract No. SPM4A7-07-M-C357 was awarded to PSI on September 14, 2007 for fifty (50) Aileron Trailing Edge Assemblies (NSN 1560-00-673-1565), to be delivered two hundred twenty (220) days after first article approval, for a cost of

C.      On Count 3, enter a judgment converting the termination for default to a termination for the convenience of the Defendant, and enter judgment in favor of Plaintiff for all applicable termination for convenience costs in an amount to be determined at trial;

D.      On Count 3 (A) enter a judgment denying the Government's claim for Administrative Reprocurement Costs resulting from the improper termination for default;

E.      On Count 4, enter a judgment denying the Government's claim for Administrative Reprocurement Costs resulting from the improper termination for default;

F.      On Count 5, enter a judgment denying the Government's claim for Retesting Costs resulting from the improper rejection of PSI's First Article;

G.      On Count 6, enter a judgment denying the Government's claim for Excess Reprocurement Costs resulting from the improper termination for default;

H.      On Count 7, enter a judgment denying the Government's claim for Excess Reprocurement Costs resulting from the improper termination for default;

I.      On Count 8, enter a judgment denying the Government's claim for Retesting Costs resulting from the improper rejection of PSI's First Article;

J.      On Count 9, enter a judgment denying the Government's claim for Excess Reprocurement Costs resulting from the improper termination for default;

K.      Award Plaintiff such other and further relief as the Court deems just.

Dated: December 31, 2013

CAMARDO LAW FIRM, PC

Joseph A. Camardo, Jr.
*Attorneys for Plaintiff*
127 Genesee Street

40

Auburn, New York 13021
Tel: (315) 252-3846
Fax: (315) 252-3508
Email: joecamardo@camardo.com